IN THE MATTER OF THE PETITION FOR CERTIFICATE OF AUTHORIZATION FOR CORPORATE NAME—OLD-TOWNE LEGAL CLINIC, P.A.

[Misc. No. 11, September Term, 1978.]

*Decided May 7, 1979.*

The cause was argued before MURPHY, C. J., and DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*Sidney Kaplan,* with whom were *Arthur Guy Kaplan, Irving Bowers* and *Paul Bloomberg* on the brief, for petitioners.

*Lewis A. Noonberg,* with whom was *Stephen J. Immelt* on the brief, for Maryland State Bar Association, amicus curiae.

MURPHY, C. J., delivered the opinion of the Court.

Kaplan & Kaplan, P.A. (Kaplan), a professional service corporation licensed to practice law in Maryland, filed a petition with this Court to use "Oldtowne Legal Clinic, P.A." as the corporate name of a separate professional association which it proposes to establish under the Maryland Professional Service Corporation Act, Maryland Code (1975), §§ 5-101 through 5-122 of the Corporations and Associations Article. The primary question before us is whether the proposed name may be used in view of the provisions of DR 2-102 (A) of the Code of Professional Responsibility, which

prohibit a lawyer from practicing law under a trade name; [1] and, if DR 2-102 (A) inhibits such usage, whether the rule violates the free speech provisions of the first amendment to the federal constitution and of Article 40 of the Maryland Declaration of Rights.

(1)

Section 5-101 (d) of the Professional Service Corporation Act (the Act) defines a professional corporation as one which is organized to perform a professional service and has, as stockholders, only individuals licensed in Maryland to perform the same professional service as the corporation. Section 5-102 of the Act authorizes one or more individuals licensed to perform the same professional service in Maryland to organize and become stockholders of a professional corporation. Section 5-105 prohibits a professional corporation from performing any professional services except through employees or agents who are licensed to perform the professional service. Section 5-109 (a) provides that the corporate name of a professional corporation shall contain the words "chartered," "professional association" or the abbreviation "P.A." Section 5-109 (b) prohibits a professional corporation from using, as part of its corporate name, any word or abbreviation for "company," "corporation," "incorporated," or any other term which indicates that it is a corporation. Section 5-110 requires that the corporate name of a professional corporation include the surname of one or more stockholders unless, *inter alia*:

"(1) The corporation has or when incorporated will have at least four stockholders;

---

1. DR 2-102 (A), effective May 1, 1978, provides:

"DR 2-102 Professional Offices.

(A) A lawyer in private practice shall not practice under a trade name, a name that is misleading as to the identity of the lawyer or lawyers practicing under such name, or a firm name containing names other than those of one or more of the lawyers in the firm, except that the name of a professional corporation or professional association may contain 'P.C.' or 'P.A.' or similar symbols permitted by law indicating the nature of the organization . . . ."

(2) The name of the corporation is approved by the appropriate licensing unit as a name which is in accordance with the established ethical standards, rules, and regulations of the profession;

(3) A certificate of authorization for use of corporate name is issued by the appropriate licensing unit to the corporation or to its incorporator."

Section 5-111 provides that to obtain a certificate of authority for a corporate name, a professional service corporation must file an application "with the appropriate licensing unit" which is defined in § 5-101 (c) to mean "the board, agency, or other entity which licenses or otherwise legally authorizes the performance of a professional service." Section 5-111 (c) requires the "licensing unit" to consult with and obtain approval of the statewide professional organization to which the majority of individuals in the State performing the same professional service belong. Section 5-111 (d) provides that if the licensing unit and professional organization approve of the proposed corporate name, the licensing unit shall issue a certificate of authorization.

In its petition to use "Oldtowne Legal Clinic, P.A." as a corporate name, Kaplan states that the clinic will service the residents of the historic area of Baltimore City known as Oldtowne; that it will be staffed with "a minimum of one paralegal at all times"; that Kaplan will "finance" the clinic and its "skill, experience and expertise . . . will be available to the clinic when needed"; and that the proposed professional association will have a minimum of four stockholders.

The Court, as the licensing unit contemplated by § 5-111 of the Act in connection with professional associations of lawyers, requested the Maryland State Bar Association to consider Kaplan's petition and to file a brief amicus curiae addressing the issues in the case.

(2)

Kaplan contends, in support of its petition, that commercial speech is entitled to all the protection that is afforded to other

forms of speech. As a consequence, it argues that since the proposed name is a form of advertisement, and is not inherently deceptive, the restriction contained in DR 2-102 (A) against lawyers practicing under trade names interferes with the free flow of commercial information and thus violates the federal and state constitutions. Kaplan relies primarily upon *Bates v. State Bar of Arizona,* 433 U. S. 350, 97 S. Ct. 2691, 53 L.Ed.2d 810 (1977), and *Va. Pharmacy Bd. v. Va. Consumer Council,* 425 U. S. 748, 96 S. Ct. 1817, 48 L.Ed.2d 346 (1976).

The Bar Association asserts that since a trade name communicates no information to the public about legal services, but merely serves to identify the seller of services, it is not protected commercial speech under the rationale of *Bates* and *Virginia Pharmacy.* It notes that Kaplan has failed to show what, if any, important information is conveyed to the public through the use of trade names. Moreover, the Bar Association relies upon *Ohralik v. Ohio State Bar Assn.,* 436 U. S. 447, 98 S. Ct. 1912, 56 L.Ed.2d 444 (1978), as additional authority supportive of the constitutionality of DR 2-102 (A)'s ban on the private practice of law under a trade name. That case held that a lawyer's in-person solicitation of an accident victim was subject to the attorney disciplinary process, notwithstanding the fact that "speech" was involved in the solicitation. The Supreme Court there observed that states retain the power to regulate the professions and that the lawyer's conduct in making the in-person solicitation was only marginally affected with first amendment concerns.

(3)

A trade name is "any designation which is adopted and used by a person to denominate goods which he markets, or services which he renders, or a business which he conducts, or has come to be so used by others, and through its association with such goods, services, or business, has acquired a special significance as the name thereof." *Edmondson Vil. Theatre v. Einbinder,* 208 Md. 38, 45, 116 A. 2d 377 (1955). In its most common usage, a trade name is a name, word, or phrase employed by one engaged in business,

as a means of identifying his products, business, or services; it may be used to indicate a part or all of a firm name or corporate name, or an abbreviation thereof. 74 Am. Jur. 2d *Trademarks and Tradenames* § 2 (1974). Trade names may include "descriptive, geographical, or personal name notations or symbols which in themselves do not necessarily identify a source ... [but which] may acquire a secondary meaning in the market as indicating a singleness of source." J. Calimafde, *Trademarks and Unfair Competition* 532 (1970). Thus, in *Edmondson Vil. Theatre,* our predecessors observed that while a geographical, locational or place name is common property which ordinarily cannot be appropriated as the subject of an exclusive trade name, if the name acquires a secondary meaning, *i.e.,* comes to signify not only a place but also the producer of a product or service, the owner may assert an exclusive right to it as a trade name. 208 Md. at 46-47.

The Canons of Professional Ethics (originally adopted by the American Bar Association in 1908 and by the Maryland State Bar Association in 1948) have, since 1928, proscribed the use of trade names by lawyers. *See Lusby v. Nethken,* 262 Md. 584, 278 A. 2d 552 (1971); *American Etc. Comm. v. Eisenberg,* 194 Md. 193, 70 A. 2d 40 (1949); H. Drinker, *Legal Ethics* 206 (1953); R. Wise, *Legal Ethics* 200 (1970). As amended in 1937, Canon 33 provided that in the selection of a firm name, "no false, misleading, assumed, or trade name should be used." Formal Opinion No. 318 (1967) of the Ethics Committee of the American Bar Association stated that the use of a trade name by a lawyer was per se unethical. This ruling was consistent with earlier unpublished opinions of the ABA Ethics Committee that "Household Associates," "McCarrus Claim Service" and "Northern Law Clinic" were trade names which lawyers were prohibited from using in their law practices. *A.B.A. Comm. on Professional Ethics, Informal Opinions,* Nos. 374-376.

The ABA adopted the present Code of Professional Responsibility in 1969; it contained the same prohibition against the use of trade names by lawyers. The Maryland State Bar Association adopted the Code on July 9, 1970, and

we, by Maryland Rule 1230, adopted the Code effective November 2, 1970.[2] The Disciplinary Rules contained in the Code represent the mandatory, minimum level of conduct required of members of the bar. *Andresen v. Bar Ass'n of Mont. Co.,* 269 Md. 313, 305 A. 2d 845, *cert. denied,* 414 U. S. 1065 (1973). Accordingly, we have heretofore disapproved the use of such proposed corporate trade names as "Legal Clinics of Maryland, Limited," "Carroll County Legal Clinic, P.A.," "The Consumer Law Center of Jacob J. Shapiro, P.A.," and "Legal Clinics of America, Ltd." [3]

We think the proposed name "Oldtowne Legal Clinic, P.A." is a trade name intended by Kaplan to designate the particular legal clinic which it plans to sponsor, finance, and operate in Oldtowne.[4] Since usage of the name violates DR 2-102(A), it conflicts "with the established ethical standards, rules, and regulations of the profession" (§ 5-110 (2) of the Act) and consequently will not be approved.

### (4)

That Kaplan possesses no constitutional right under the commercial speech doctrine as explicated in *Virginia Pharmacy* and *Bates* to use a trade name in operating a legal clinic is clear from *Friedman v. Rogers,* 440 U.S. 1 , 99 S. Ct. 887, 59 L.Ed.2d 100 (1979). In that case the Supreme Court was confronted with a Texas statute which prohibited an optometrist from practicing optometry under a trade name. Rogers, a commercial optometrist who practiced under the name "Texas State Optical" or "TSO," sought to enjoin the statute's enforcement. He was supported by an intervening senior citizens association which urged that the prohibition

---

2. The prohibition against trade name usage was originally included as DR 2-102 (B).

3. The Committee on Ethics of the Maryland State Bar Association, in an opinion dated January 23, 1979, indicated its belief that the prohibition of DR 2-102 (A) would be violated by use of such trade names as "The East Baltimore Legal Clinic," "Bel Air Legal Clinic," and "Harford Legal Clinics."

4. Kaplan stated during oral argument that it desired to use the proposed name, rather than its own firm name, so that its regular clients would not know that there was any connection between it and the Oldtowne Legal Clinic.

of the practice of optometry under a trade name violated the First Amendment right of its members to receive information about the availability of optometrical services. The Court concluded that the statute was a constitutionally permissible restriction on deceptive and misleading commercial speech. In so holding, it acknowledged that while *Virginia Pharmacy* and *Bates* extended First Amendment protection to truthful price advertising by pharmacists and lawyers, those decisions had not deprived the states of all power to regulate commercial speech. Quoting from *Virginia Pharmacy,* the Court said that "restrictions on the time, place, or manner of expression are permissible provided that 'they are [imposed] without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information.'" 99 S. Ct. at 894. The Court recognized that it was equally permissible for the states to impose restrictions on false, deceptive or misleading commercial speech since they have a legitimate interest in insuring "'that the stream of commercial information flows cleanly as well as freely.'" *Id.*

The Court observed that a trade name is used as part of a proposal of a commercial transaction and is a form of commercial speech. It acknowledged that a trade name like "Texas State Optical" or "TSO" could serve to identify an optometrical practice and to convey information about the type, price and quality of services offered for sale. But a trade name, the Court said, is a significantly different form of commercial speech from that considered in *Virginia Pharmacy* and *Bates.* It explained:

> "In those cases, the State had proscribed advertising by pharmacists and lawyers that contained statements about the products or services offered and their prices. These statements were self-contained and self-explanatory. *Here, we are concerned with a form of commercial speech that has no intrinsic meaning.* A trade name conveys no information about the price and nature of the services offered by an optometrist until it acquires

meaning over a period of time by associations formed in the minds of the public between the name and some standard of price or quality. Because these ill-defined associations of trade names with price and quality information can be manipulated by the users of trade names, there is a significant possibility that trade names will be used to mislead the public." (Italics added.) 99 S. Ct. at 895-96.

As examples of the deceptive possibilities inherent in the use of trade names by optometrists, the Court observed that a trade name allows the name of an optometrical practice to remain unchanged, even after the departure of the optometrist whose reputation or skill attracted the public to that particular office. Secondly, it said that an optometrist who is negligent or is guilty of professional misconduct may successfully conceal his reputation from the public by assuming a new trade name. Additionally, the Court recognized that a false appearance of competition can be created among shops of common ownership which bear different trade names. Finally, it said that trade names facilitate the advertising of large-scale commercial optometrical practices, and the state may have a rational purpose to discourage such commercialization.

The Court found that the concerns of the Texas Legislature about the deceptive and misleading uses of optometrical trade names were not speculative or hypothetical, but were based on experience involving the deceptive misuse of such trade names. It concluded that "the State's interest in protecting the public from the deceptive and misleading use of optometrical trade names is substantial and well-demonstrated," and that the statutory prohibition was "a constitutionally permissible state regulation in furtherance of this interest." 99 S. Ct. at 897. In so holding, the Court emphasized that the restriction on the use of trade names had only the most incidental effect on the content of commercial speech. Since the Texas statute did not proscribe or limit the type of informational advertising held to be protected by *Bates* and *Virginia Pharmacy*, the Court said that optometrists would incur no penalty for communicating

freely to the public any factual information associated with trade names, such as the type and price of services offered, or the nature of their professional practices.

Like the Texas prohibition on the use of optometrical trade names, DR 2-102 (A)'s ban upon the use by lawyers of trade name is, we think, a permissible restriction on potentially deceptive and misleading commercial speech which violates neither the First Amendment nor Article 40 of the Maryland Declaration of Rights.

(5)

We deal finally with Kaplan's allegation that DR 2-102 (A) denies it equal protection of the law because physicians are under no ethical restraints regarding trade name usage and are in fact permitted by their licensing unit, The Medical and Chirurgical Faculty of Maryland, to practice medicine under trade names.[5] Kaplan claims that because physicians and lawyers must be afforded uniform treatment in the use of trade names, lawyers are unconstitutionally denied the same right to commercial speech that physicians enjoy in the promotion of their professional practices.

A similar equal protection argument was raised in the *Friedman* case on the ground that there was no statutory inhibition against the use of trade names by ophthamologists. The Court, in finding the argument to be without merit, stated that the trade name prohibition imposed on optometrists was responsive to a demonstrated need to restrict the business of optometry, whereas no such need was shown to exist as to ophthamologists.

That no ethical rules apparently exist prohibiting physicians in Maryland from practicing medicine under a trade name does not mean that the restrictions contained in DR 2-102 (A) constitute a violation of the equal protection

---

5. The record discloses that the following corporate names have been approved for use by physicians: Eastern Medical Association, P.A.; Prince George's Hospital Radiology Group, P.A.; Chesapeake Physicians, P.A.; West Baltimore Physicians, P.A.; West Pratt Medical Association, P.A.; University of Maryland Physicians, P.A.; and Belvedere Pathology Associates, P.A.

clause. It is, of course, elementary that that clause does not require that different professions be treated in the same manner, particularly where, as here, the ethical considerations governing the two professions are not the same. Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, the constitutionality of the statutory discrimination is presumed and the classification will be sustained if it is rationally related to a legitimate state interest. *New Orleans v. Dukes,* 427 U. S. 297, 96 S. Ct. 2513, 49 L.Ed.2d 511 (1976); *Donnelly Adv. Corp. v. City of Balto.,* 279 Md. 660, 370 A. 2d 1127 (1977). For reasons similar to those set forth in *Friedman v. Rogers, supra,* with respect to optometrists, we think that DR 2-102 (A), the precursor of which has been in effect since 1928, is rationally related to a legitimate state interest. *See also Wall v. American Optometric Assoc.,* 379 F. Supp. 175 (N.D. Ga.), *aff'd,* 419 U. S. 888 (1974), and *Montgomery Co. v. Fields Road,* 282 Md. 575, 386 A. 2d 344 (1978).

*Petition denied.*